SMITH *vs.* ST. LOUIS MUTUAL LIFE INSURANCE COMPANY and others.

April Term, 1877.

INSURANCE COMPANY—CONTRACT ULTRA VIRES.—An agreement by which one life insurance company transfers to another life insurance company all of its assets, of whatsoever name and nature, in consideration of the latter company undertaking to reinsure all the risks, and to assume and pay all the debts and liabilities of the former company, is *ultra vires* and void, although the vendor company may be authorized by its charter to reinsure its risks.

SAME—FAILURE TO USE FRANCHISE—INSOLVENCY.—If the result of such a transaction is to induce the vendor company to cease to use its franchises, and to produce practical insolvency, the policy-holders and creditors of the corporation in this state may, under our laws, without first obtaining a judgment at law, attach the property of the corporation by a bill in chan-

cery, and subject the same to the satisfaction of their debts, the rights of the policy-holders becoming fixed as of the date of the transaction, upon the ground of a determination of the contract by the company.

SAME—EXTENT OF RECOVERY BY POLICY-HOLDER.—Each policy-holder—upon a determination of the contract by the insolvency of the company, or its voluntary *cesser* of the use of its franchises—whose policy is in full force, either for the original or a commuted sum, is entitled to recover the equitable value of his policy—that is, the difference between the cost of a new policy and the present value of the premiums yet to be paid on the policy at the date of the breach, subject to a deduction from the sum thus found of any unpaid premium note of the assured, with interest. If the policy be only running out an extension under the temporary insurance clause, the equitable value would be the cost of a similar policy for a person of the age of the policy-holder at that day for the length of time the policy had to run.

PREMIUMS PAID TO THE CONVEYEE COMPANY.—A policy-holder in the vendor company who, after the attempted transfer, has paid premiums to the conveyee company, without the issuance to him by the latter company of a new policy, and his acceptance thereof with full knowledge of the facts, is entitled to recover from said latter company the premiums thus paid, with interest.

LOAN NOTE—FORFEITURE FOR NON-PAYMENT OF INTEREST IN ADVANCE.—Where part of the premium is loaned to the insured upon his note at one year, the interest being paid in advance, and the policy expressly provides that, if the insured fail to pay annually in advance the interest on any unpaid note or loans, the policy shall cease and determine, the interest becomes practically a premium payable annually in advance; and the policy lapses as in other cases if the premiums be not promptly paid. But the company would be bound to apply the dividend to which the policy-holder might be then entitled in such a manner as to save the forfeiture—that is, first to the payment of the interest.

PUBLISHED RULE—TEMPORARY EXTENSION.—If an insurance company publicly advertise that it has made its annual life policies, "now in force or hereafter to be issued," non-forfeiting, by extending the full amount of the insurance over a definite period of time, to be ascertained in a particular mode, policy-holders may claim the benefit of the extension without any clause in the policy to that effect.

*M. M. Brien, jr.*, for complainant.
*R. McP. Smith*, for defendants.

THE CHANCELLOR:—In the year 1866 the defendant the St. Louis Mutual Life Insurance Company, a corporation chartered by the legislature of the state of Missouri for the purpose of life insurance on the mutual plan, with a stock capital of $100,000, and having its principal place of business at St. Louis, extended its business into this state by making the necessary deposit of bonds with the comptrol-

ler " as security for risks taken by citizens of this state,"
by the employment of local agents, and by making con-
tracts with, and issuing policies to, citizens of this state.
The local agents were supplied with manuals and circulars
warmly commending the system of life insurance generally,
and the peculiar advantages of the St. Louis company in
particular. These manuals and circulars were freely dis-
tributed, and, aided by the persuasive eloquence of the
agents, induced a large number of citizens of this state to
take policies of insurance on their lives in the defendant's
company. The contents of the manuals and circulars were
substantially the same from the beginning to the end, being
slightly altered to meet certain modifications in the mode of
conducting the business, presently to be noticed. The poli-
cies proposed to be issued were either on the endowment
plan, stipulating for the payment of a fixed sum at a defi-
nite period, or for life. The premiums might be paid in a
single payment, in five annual payments, in ten annual pay-
ments, or annually during life, and the payments each year
might be made at one time, or semi-annually, or quarterly.
It was also provided that, when the annual premiums
amounted to $50 or more, a loan would be given for half
the amount, " but on all such loans six per cent. interest
must be paid every year in advance," and, it is added, " a
failure to pay the interest in all cases forfeits the policy."
In 1868 the proportion of loan was reduced to one-third of
the premiums, but the other provisions still continued the
same. A prominent feature of all the manuals was that the
policies on which the premiums were to be paid by instal-
ments were to be non-forfeitable after a certain number of
payments, according to a table given, " all in cash," to
the amount of their equitable value, " which," say the
manuals, " will in all cases (up to the age of fifty) equal
the full amount of the premiums paid." It was further
stated that parties holding non-forfeiting policies were not
required to surrender them to the company within a cer-
tain time, in order to have a new policy issued to secure

the non-forfeitable proportion, but the policy was so worded as to make it stand good for such proportionate amount, on failure to meet any instalment of premium.

According to these provisions a policy was non-forfeitable, without a surrender, after the payment of a certain number of premiums "*all in cash.*" A large number of the policy-holders, however, accepted the proposition of taking the loan of a part of each premium, giving notes therefor at one year, and paying the interest in advance. All the manuals contain the provision on that particular character of case hereinbefore recited, and the policies themselves embody similar provisions, the conditions being worded as follows:

"1st. That, if the two annual premiums next due and payable after the date hereof shall be well and truly paid, and default shall be made in the payment of any of said annual premiums thereafter to become due and payable at the time hereinbefore mentioned, and limited for the payment thereof, respectively, then and in such case such default shall not work a forfeiture of this policy, but the sum of $———, the amount insured, shall be then commuted or reduced to such proportional part of the whole sum or amount insured as the sum of the annual payments so paid by the said insured shall bear to the sum of the number of annual payments stipulated and agreed to be paid by said assured, as aforesaid." Or, in a policy in which the premiums are to be paid annually during life, "shall be commuted to the sum of the annual premiums paid."

"2d. If the said insured shall fail to pay the two annual premiums next due and payable after the date hereof, on or before the day above mentioned for the payment thereof, or shall fail to pay annually, in advance, the interest on any unpaid notes or loans which may be owing by said insured to said company, on account of any of the above-mentioned annual premiums, at the office of the company at the city of St. Louis, or to agents when they produce receipts signed by the president or secretary, then, and in every such case, the said company shall not be liable for the pay-

ment of the sum assured, or any part thereof, and this: policy shall cease and determine."

Later manuals state, in addition, that the company has. made its annual life policies, " now in force or hereafter to be issued," non-forfeiting, by extending the full amount of" the insurance over such period of time as the " premium reserve " or " value of the policy " will pay for, applied as: a single premium for temporary insurance, any indebted-- ness standing against the policy to be deducted from the. reserve. The condition inserted in subsequent policies to cover this provision is thus worded : " That, in case any premium due upon this policy, or any note given for part of the premium, shall not be paid at the day when payable,. the policy shall thereupon become forfeited and void, except. to the following extent : The net value of the policy on that. day shall be ascertained according to the ' combined expe-- rience' or ' actuaries' ' rate of mortality, with interest at the. rate of four per cent. per annum, from which value shall be: deducted whatever is due to the company, including any unpaid premium notes, with interest at six per cent. per annum thereon ; the remaining value shall be considered a. premium for temporary insurance, and the term for which it shall insure shall be determined according to the age of the insured when said unpaid premium became payable,. upon the aforesaid assumption of mortality and rate of interest ; and during said time, and no longer, this policy shall continue in force, provided no other cause of forfeit- ure exists ; and the company shall have the right to deduct. from the amount insured in the policy the amount, at six per cent. per annum,. of the premiums that had been forborne at the time of the death." The rule itself would,. perhaps, have been effective without the clause of extension. *Salvin* v. *James*, 6 East, 571 ; *Wood* v. *Dwarris*, 11 Exch.. Rep. 493 ; *Rose* v. *Mutual Benefit Life Insurance Co.*, 24. N. Y. 653.

Another subject dwelt upon by the agents of the com- pany, and which, no doubt, largely influenced the taking of"

policies, was that of dividends. The manuals contain, on this subject, the following clause : " The whole surplus of this company belongs to the policy-holders, and is annually divided. By the present practice of the company, dividends are credited annually until the end of the fourth year from the date of the policy, when the first is paid ; and are annually thereafter through life, or the continuation of the policy, in cash to those who have paid cash, or to the reduction of the notes to those to whom loans have been made." The representations were that these dividends would, at the then rate of dividend, which was likely to continue, pay the notes given for part of the premium, so as, after the first four years, to leave only one or two, or none, of these notes outstanding. The witnesses differ as to the extent of the benefit promised and expected. The "flush times" then prevailing, as they induced many persons to take out policies for large amounts, the premiums on which in a few years became intolerably burdensome, so they led the insurance company to extravagance, and to the making of larger dividends than could afterwards be kept up. The dividends for the years 1865, 1866, and 1867 were 40 per cent. of the annual premiums. In the year 1868 the company changed its plan of making dividends from the percentage to the contribution plan, and thereafter made dividends on the business of 1869, 1870, and 1871 on the 1st of January of the succeeding year, which were paid at the next renewal of the policy. The dividends were much smaller than during the preceding years, and, according to the allegations of the bill, were not applied with exact regularity to all the policies. In the year 1871 the company, on account of the diminution of business and its increasing financial embarrassments, withdrew its local agents from this state, and required the policy-holders, unless they chose to remit direct to St. Louis, to make payments through some bank to which receipts were sent.

In the month of March, 1869, the legislature of the state of Missouri enacted a law for the regulation of life insurance

companies, requiring such companies to keep their reserve on a 4 1-2 per cent. basis. Up to that time there had been no statute on the subject, and the company claims. that it had estimated its reserves on a 6 per cent. basis, and that the law could only operate upon policies subsequently taken out. After the passage of the act, it is. doubtful whether the company ever was in a condition to meet its requirements, even upon the construction thus put. upon it; and it is certain that the continuous shrinkage in values of the stocks, bonds, and realty in which its funds. were invested reduced its reserve in the next few years to a point below what was essential to the safety of its policy-holders. Internal dissensions among the stockholders, and between them and the policy-holders, added to the company's embarrassments. Its credit necessarily suffered, and the policy-holders, especially those in a distant state, were placed in a position of grave difficulty. That many of them ceased to pay their premiums promptly, or at all, is. not surprising. Some of the complainants to this bill quit. paying as early as 1868, the number of those adopting this. course increasing each of the following years.

In the summer of 1873 a new board of directors seems. to have been elected by the policy-holders of the St. Louis Mutual Life Insurance Company, in place of the stockholders' board, which had controlled the business of the company previously. On the 6th of October, 1873, the superintendent of the insurance department of the state of Missouri commenced proceedings in court against the company to enforce the provisions of the statute regulating insurance companies, to enjoin the company from transacting business, and to wind it up. Under these circumstances the directory, as they announced to the policy-holders in a circular, "concluded it would be better for the interest of all of the policy-holders of the company to enter into an agreement. with the Mound City Life Insurance Company, of St. Louis, the substance of which is that, if the last-named company shall, within the next sixty days, increase its capital stock.

to $1,000,000, we will transfer to it all of our risks and assets." The Mound City Life Insurance Company was a stock corporation chartered by the state of Missouri, with a capital of $500,000. On the 13th of December, 1873, a formal contract was entered into by the two companies, by which the St. Louis Mutual agreed, upon the Mound City Company's increasing its capital stock as above, to transfer to it all its assets, "of whatsoever name and nature," that company undertaking to reinsure all the risks, and to assume and pay all the debts and liabilities of the former company. This agreement was approved by the superintendent of the insurance department of the state of Missouri, and, on the 17th of December, 1873, at his instance, the proceedings then pending against the St. Louis Mutual Company were dismissed. The capital stock of the Mound City Company was, it seems, increased within the sixty days according to contract, and about the 17th of January, 1874, the contract between the two companies was practically consummated by its taking possession of the property and business of the St. Louis Mutual Company. Afterwards the Mound City Life Insurance Company changed its name to the St. Louis Life Insurance Company, and again to the Columbia Life Insurance Company. Later still, the stockholders of the Life Association of America, another corporation of the state of Missouri, seem to have purchased a controlling influence in the stock of the Mound City, *alias* St. Louis Life, *alias* Columbia Life, Insurance Company, and the two companies are managed by the same directors and officers, but under, it is said, their separate organizations.

On the 11th of August, 1875, the original bill in this cause was filed by the complainants, claiming to be the holders of policies issued by the St. Louis Mutual Life Insurance Company, against that company, the St. Louis Life Insurance Company, being the Mound City Life Insurance Company under its new name, and William Morrow, the treasurer of the state of Tennessee and commissioner

of the insurance department thereof.   On the 29th of October, 1875, an amended bill was filed by the same and other complainants against the same defendants, and a number of persons named as the directors and officers of the two defendant companies, or stockholders of one or other of the companies at the date of the transaction of the 13th of December, 1873, and implicated in some way therein.   On the 20th of November, 1875, a second amended bill was filed by the same and other complainants against the same parties and W. T. Glasgow, agent for the St. Louis Life Insurance Company, residing in this state. On the 15th of January, 1876, a third amended bill was filed by the same and other complainants against the same defendants, the Life Association of America, and William M. Ransom, another agent of the St. Louis Life Insurance Company, residing in this state.   Subsequently other persons claiming to be policy-holders of the St. Louis Mutual Life Insurance Company have made themselves parties complainant, by petition, to this suit.

It will simplify the consideration of the case to say that the Life Association of America has filed an answer disclaiming all interest in the matters of litigation, or in the property sought to be reached.   One object of the bills is to have a personal recovery against the individual defendants, other than Morrow, Glasgow, and Ransom, by reason of their alleged malversation in office, supposed fraudulent conduct, reception of illegal dividends, or of moneys received wrongfully for their aid in consummating the arrangement of the 13th of December, 1873.   These defendants are all non-residents of this state, and residents of the state of Missouri.   They have neither been served with process, nor brought before the court by attachment of property ; nor have they, or any of them, entered an appearance.   The acts complained of, if committed at all, were committed in the state of Missouri, not in this state, and are not such as to give the court jurisdiction under any of the provisions of our statute law touching the jurisdiction of this court,

which, in the absence of statute, is declared to be *in personam*. Code, § 4305, *et seq.; Grewar* v. *Henderson*, 1 Tenn. Ch. 76. The suit necessarily fails so far as these defendants are concerned.

The real litigation is between the complainants and the two companies parties to the transaction of the 13th of December, 1873, the other defendants, citizens of this state, being the mere holders of property belonging to the one or the other of these companies, as that transaction may be held to be valid or invalid. And, as to that contract or transaction, the learned counsel for the two insurance companies, in his very able argument, conceded that it could not be upheld. It was based upon the idea that it was, in substance, a reinsurance, and that, as the St. Louis Mutual was authorized by its charter to reinsure its risks, it might reinsure the whole "at one fell swoop." The answer is that the power to reinsure was given to preserve the company in certain exigencies, and that it would be a perversion to turn it into an instrument for its self-destruction. A still stronger reason is that reinsurance is a contract exclusively between the reinsuring parties, and will not justify a transaction which contemplates the binding of third parties, and which does, in effect, imperil the rights of all the policyholders of one of the contracting parties. The transaction was clearly *ultra vires* and void. *Ernest* v. *Nicholls*, 6 H. L. Cas. 401. And so it has been held to be by the St. Louis court of appeals, in the case of *Celsus Price, Superintendent of the Insurance Department of Missouri* v. *St. Louis Mutual Life Insurance Company and others.* This leaves the property attached in this cause subject to the claims of citizens of this state against the St. Louis Mutual Life Insurance Company. In this view, too, the St. Louis Life Insurance Company is liable to any of the complainants for such premiums as they may have paid to it without the issuance by it, and acceptance by the assured, of a new policy with full knowledge of the facts. Any payments made when there was no new contract, and when the payor

was not fully advised of the facts, would be without consideration. The liability of the St. Louis Life Insurance Company for the property transferred is to the St. Louis Mutual Life Insurance Company, not to the policy-holders of that company directly. It is true, if the company should refuse to act, and could not be put in motion through its ordinary machinery, the policy-holder might come into equity for relief. No such case is made by the bill, nor is the bill framed for any such purpose. The object of the complainants is to reach the property of the St. Louis Mutual Life Insurance Company in this state.

The proof is clear that the St. Louis Mutual Life Insurance Company has not used its corporate franchises since the 13th of December, 1873, or, at any rate, within thirty days thereafter. It falls, therefore, within the provisions of the Code, §§ 3431 and 4294. By these sections, when the corporate franchises are not used, the creditors of the corporation may, without first having obtained a judgment at law, attach the property of the corporation, and subject the same to the satisfaction of their debts. The proof is, moreover, conclusive that the St. Louis Mutual Life Insurance Company is insolvent, not only because it fails to meet the requirements of the statute law of the state of Missouri regulating life insurance companies, but in fact. As soon as this event occurred, the persons in possession of its effects in this state became trustees for the benefit of its creditors. The assets of an insolvent moneyed corporation, under our statutes and decisions, constitute a trust fund in whosoever hands they may be for *pro rata* distribution among all its creditors. *Marr* v. *Bank of West Tennessee*, 3 Coldw. 471 ; *Moseby* v. *Williamson*, 5 Heisk. 286. The property attached in this suit, outside of the bonds in the hands of Morrow, is subject to the claims of such of the complainants, and other persons, citizens of this state, who may come in under the decree, as may show themselves to be creditors of the St. Louis Mutual Life Insurance Company. The bonds in Morrow's hands are

47

held, under the statutory trust, " as a security for risks taken by citizens of this state." I held, in *Pennebaker* v. *Tomlinson*, 1 Tenn. Ch. 594, that the beneficiaries under this trust are such citizens of the state as, having taken out policies to cover risks, have suffered loss within the policy, or have become entitled to be repaid the premium, or any part thereof, in any of the contingencies in which such repayment is demandable as of right, and that the beneficiaries are entitled to share the funds *pro rata*. I held, also, in the same case (1 Tenn. Ch. 111), that the comptroller for the time being (the then head of the insurance bureau of the state) would have the right to come into this court, in the event of the insolvency of the insurance company, for the administration of the trust fund. Of course the beneficiaries themselves are entitled to the same relief as against the treasurer (who has been charged with the duties then devolving upon the comptroller), who is a mere trustee. The non-user and insolvency of the St. Louis Mutual Life Insurance Company date certainly from the 13th of December, 1873. Its insolvency might, perhaps, have been carried back to a much earlier date ; but the bill, by a curious inconsistency, after averring in the first bill that the company was insolvent at and before that date, expressly avers in the third amended bill that the company was solvent, and that transaction unnecessary. Such of the complainants as were, on the 13th of December, 1873, holders of policies of the company then in full force, or entitled to be repaid premiums on policies of the company, would be beneficiaries as to the bonds in Morrow's hands, to be shared, after the deduction of costs and expenses, ratably. And all the complainants having just claims as creditors of the said company at the filing of the bill would come in for a share of the other property attached, if any, in like proportion.

It is urged in argument by the learned counsel for the defendants that the complainants who were holders of policies in force on the 13th of December, 1873, whose

lives or terms have not yet fallen in, are not now entitled to recover anything, and, therefore, the bill, even as to them, is premature. He cites, in support of this position, *King* v. *Accumulative Life Fund, etc.*, 3 C. B., N. S. 151; *s. c.*, 5 Big. 635; *Robertson* v. *St. Louis Mutual Life Ins. Co., per* Treat, J., in U. S. Cir. Ct., St. Louis; *Borden* v. *Same*, by the St. Louis court of appeals. The reason given is that the action is *quia timet*, and premature; for *non constat* that, when the money becomes due, it will not be paid by the company. In each of these cases the company had undertaken to transfer and dispose of its property to another company, and ceased to do business. The courts concede the general principle that, where a party who has contracted to do something at a future day, does an act which precludes performance, an action will lie at once for the breach, without waiting until the day of performance. It is usual to cite, as illustrating the rule, the case of a person contracting to sell a particular tract of land at a future day to one man, and then actually selling it to another; and a promise to marry at a future day, and afterwards marrying a third person. Why may not an action brought in these instances be, with equal reason, said to be *quia timet* and premature; for *non constat* that the vendor may not buy back the land and be ready to comply; and that the husband or wife of the married person might not die, and so the promiser be ready to marry to the day? The reason for the rule is, that the act done, being in plain violation of the trust created by the contract, estops the party to deny the breach, and the court will not, in such a case of palpable wrong, weigh probabilities or possibilities. The reason given for the rulings cited are certainly not satisfactory, although the ruling may be right at law.

There are decisions in suits upon life policies to the contrary. *Mead* v. *St. Louis Mutual Life Insurance Co.*, 51 How. Pr. 1; *McKee* v. *Phœnix Insurance Co.*, 28 Mo. 386; *Union Central Life Insurance Co.* v. *Poettker*, Super. Ct. Cin., 2 C. L. J. 792. Perhaps the distinction in these cases

at law turns upon the fact whether the company has ceased to do business, or is, to use Lord Cairns' expression, in *Lancaster's Case*, L. R. 14 Eq. 73, note, "a going company." This distinction is made by the superior court of Cincinnati in the case above cited. "Where an insurance company," say the court, "does not go into liquidation, but continues in the business of life insurance, and wrongfully refuses to continue its risk upon the life of one it has insured, the insured may sue the insurer for damages, and recover, at least, the amount of the several premiums he has paid, with interest." There is no good reason why a life insurance company, in active business, should not be liable at law for a positive breach of contract, the damages to be regulated by the rules applicable to breaches of contract. It would be otherwise where the breach is passive, from insolvency, non-user of franchises, or a contract *ultra vires*. In such cases the parties should be required to seek relief in equity.

And, whatever may be the doubt as to the rule at law, there is none whatever as to the rule in equity. It has been decided in England that the non-payment of a premium of insurance falling due after an order issued, upon the petition of the company, to wind up the affairs of the company, does not work a forfeiture of the rights of the insured against the company. This is practically a determination of the contract by the company, not by the policy-holder, and the latter need take no further step to keep the policy alive, but may prove his claim for damages as of the day when the order to wind up took effect. *In re Albert Life Assurance Co.*, L. R. 9 Eq. 702. So, also, if the company has become insolvent. *Conigland* v. *Insurance Co.*, 1 Phill. (N. C.) Eq. 341. The same rule would undoubtedly apply upon the filing of a bill in Missouri by the superintendent of the insurance department, if successfully prosecuted. It would also apply upon a bill filed under our statutes for failure to use corporate franchises. No good reason can be seen why the like result should not attend a

disposition by a company of all its property, even when *ultra vires*, if in fact it virtually leads to a cessation of business. Whatever may be the doubt at law about actions *quia timet*, there is none in equity. Nothing could be more grossly inequitable than to require policy-holders to continue the payment or tender of premiums under such circumstances. The court of chancery is ready and able to give adequate relief in one suit, by an adjustment of the rights of all the parties to the common fund, without procrastinating the evil day in the vain hope that "something may turn up." The bill goes upon the idea that the complainants are, in the events which have happened, entitled to the premiums paid, with interest. But this would be manifestly unjust to the company, and unequal as between the policy-holders themselves. What each should have is the present, or equitable, value at the time of the breach, namely, the 13th of December, 1873. *New York Life Ins. Co.* v. *Statham*, 3 Otto, 24; *s. c.*, 5 Big. 607; *s. c.*, 3 C. L. J. 723; *Smith* v. *Charter Oak Life Ins. Co.* (Cir. Ct. St. Louis Co.), 5 Big. 212; *In re Albert Life Assurance Co.*, L. R. 9 Eq. 706; *Holdich's Case*, L. R. 14 Eq. 72. The equitable value, says the Supreme Court of the United States, in the case first cited, is the difference between the cost of a new policy and the present value of the premiums yet to be paid on the policy when the breach occurs. It is, says the English court, with the matter-of-fact practicality so characteristic of the English mind, the sum which would be required in each particular case to purchase a policy of the same amount at the same premium in a solvent office. The rule is, in substance, the same as laid down by both the English and American courts. The recovery is limited to the reserve which the company ought to have had on hand at that time in each case, subject to such addition, if any, as may be required in a particular case to meet an exceptional change of bodily health. In this case, where the fund will in any event be inadequate, the general rule as laid down by the Supreme Court of the United States is adequate to the exigency. It can be readily applied by a competent actuary.

It is claimed by the counsel of the defendants that some of the complainants, whose policies are conceded to have been in force on the 13th of December, 1873, afterwards made payments to the St. Louis Life Insurance Company, and that such payments bar the right of recovery. But the mere payment of premiums to, and taking the receipts of, a new company, even when the amalgamation was lawful, has never been construed into a novation. *In re Manchester and London Life Association*, etc., L. R. 5 Ch. App. 640. It should appear, says Lord Westbury, that the new company had the corporate power to assume the contracts of the old company; that the act of transfer was communicated to the assured, with an offer to him to accept either a new policy or an assumption of the old one, and the acceptance of the offer must be proved by " acts which unequivocally denote his understanding and acceptance of that proposal." There must be evidence of an intention to make a new contract as plainly as if it were expressed in writing. *Coghlan's Case*, Reilly's Rep. 46; *Blundell's Case*, Id. 84. These are the principles which govern a novation of other contracts, and no reason occurs why they should not apply to a reinsurance. But, of course, there can be no novation where the supposed contract of reinsurance was void. In such a case there must be a new contract out and out, with knowledge.

The only difficulty in ascertaining whether a new policy, forfeited or lapsed previous to the 13th of December, 1873, was extended or commuted, under the conditions embodied in it, or under the rule of the company which made all its annual life policies non-forfeitable, so as to be in force on that day, arises on the provision for the payment of interest in advance on unpaid notes or loans, and on the application of dividends. The decisions on the condition in question in the policies of this very company are hopelessly in conflict. In the *St. Louis Mutual Life Ins. Co.* v. *Grigsby*, 2 C. L. J. 123, 4 Big. 633, the supreme court of Kentucky held that the note given for part of the premium was for money loaned, and that the interest

annually accruing on these loans is in no sense an annual premium due from the insured to the insurer, and that the forfeiture was in the nature of a penalty which could be relieved against in equity. In *Anderson* v. *St. Louis Mutual Life Ins. Co.*, 3 C. L. J. 354 5 Big. 527, a case in equity, decided in the United States circuit court at Memphis, Brown, J., held that the payment of the interest was a condition precedent to the continued existence of the policy. He held, also, in the same case, basing his decision upon the usage of the company, as shown in the particular case, that the dividend then due the assured should be applied to the extinguishment of so much of the note; and not to the satisfaction of the interest with a view to save the forfeiture. In *Russum* v. *St. Louis Mutual Life Ins. Co.*, 3 C. L. J. 275, 5 Big. 243, the St. Louis court of appeals came to the same conclusion as Brown, J., on the first point, while they held it to be clear law that the company was bound to apply the dividend in such manner as to save the forfeiture. The learned circuit judge of the United States for this circuit, Hon. H. H. Emmons, has, also, in cases removed from this court, reached the conclusion that, on failure to pay the interest on the loan notes, the policy lapses. The weight of authority is undoubtedly in favor of this construction.

The notes taken for a part of the premium are treated by the company in its manuals and policies as given for loaned money, and, in that view, it is difficult to meet the logic of the argument that the interest which would accrue upon a note after maturity is merged in the note, and must take its quality and share its fate. Exact logic is often too nice and refined for the practical business of life, when stretched "upon the rack of this rough world," and must give way to the clearly expressed intention of parties. In *Patch* v. *Phœnix Mutual Life Ins. Co.*, 44 Vt. 481, 4 Big. 777, the notes given in part for premiums were made payable twelve months after date, with interest at 6 per cent., payable annually in advance. A paid-up policy, given in exchange for the original policy under the commutation clause, con-

tained no reference to the notes, and only a general stipulation for the prompt payment of premiums. On the margin was written a memorandum that the policy was conditional on the interest on the notes being paid in advance. The court say : " Treating the memorandum as a part of the policy, the interest upon the notes becomes *practically a premium* upon the policy, payable annually in advance. Any other construction would be a manifest violation of the meaning and intent of the parties to this contract." In all of the manuals of the St. Louis Mutual Life Insurance Company, whenever a loan of a part of the premium is spoken of, it is provided, as we have seen, thus : " But on all such loans 6 per cent. interest must be paid every year in advance," and, it is added, " a failure to pay the interest in all cases forfeits the policy." The policies themselves, as we have also seen, expressly provide that, if the insured " fail to pay annually in advance the interest on any unpaid notes or loans which may be owing by the said insured to said company," the policy shall cease and determine. The interest upon the notes becomes practically a premium on the policy, payable annually in advance. " Any other construction would be a manifest violation of the meaning and intent of the parties to this contract."

The question as to whether the application of the dividend should be to the note or interest is, probably, of no practical importance in this case. I am of opinion, however, with the St. Louis court of appeals, that the company was bound, upon the plainest principle of equity, to apply the dividend first in such a manner as to save the forfeiture. The usage of the company in deducting the dividend from the principal in cases where the insured elects to continue the policy, even if uniform and unvarying, cannot control where the insured ceases to pay, and the contract is silent as to what should be done with the dividend. The law, which tempers justice with mercy, makes the proper application. Besides, the condition of the policy only requires in such case the payment of interest in advance, not of any

part of the note as a prerequisite to the continued existence of the policy. The dividend, as the property of the insured, should be applied to what he is bound to pay—the interest. And to this end the policy-holder may show that he was entitled to a dividend to be thus applied.

One of the prayers of the bills in this case is that "the policies and notes be declared void *ab initio* for fraud." If this prayer is based upon the idea that the contracts were rendered void *ab initio* by any fraudulent representations by the company or its agents, within the decision of *Martin* v. *Ætna Life Ins. Co.*, 9 Heisk., I am of opinion that the bills fail to make out any such case; the evidence is still more deficient in this regard, and all claim for relief on this score has long since been waived by payments of premiums after the facts were fully known. Moreover, the bill expressly avers the validity of the policies on the 13th of December, 1873. If the prayer is rested upon the supposed fraudulent conduct of the directors of the company in making dividends beyond what was reasonable, in devoting such a large proportion of their funds to the erection of the costly edifice in St. Louis, in a portion of which it had its offices, and in the malversation committed by the transaction of the 13th of December, 1873, I am of opinion that these are not causes which render the policies void *ab initio*. They do not, if true, affect their validity at all. The contracts of the company must stand or fall on their own merits.

The complainants whose policies were in force on the 13th of December, 1873, and such other policy-holders in like situation who may file their claims in time, are entitled to subject the property attached in this cause *pro rata* to the satisfaction of their claims. It must be referred to the master to ascertain and report, upon the principles herein settled, which of the complainants have such claims, and the amount due to each. And to this end proof may be taken as to the right of the complainants to dividends to be

applied to the satisfaction of interest. It may also be referred to the master to ascertain and report the amount of premiums paid by any of the complainants since that date to the St. Louis Life Insurance Company.